### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

TSUNG-YING TSAI,

    Plaintiff,

    v.

INSPIRE, INC., BRETT KLEGER,
RUSSELL BANTHAM and DAN LEVINE,

    Defendants.

Civil Action No. 25-1774-TDC

### MEMORANDUM OPINION

Plaintiff Tsung-Ying Tsai has filed this civil action against his employer, Defendant Inspire, Inc. ("Inspire"), and three Inspire officials, Defendants Brett Kleger, Russell Bantham, and Dan Levine ("the Individual Defendants"), in which he alleges a breach of contract and a violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3–501 to § 3–509 (LexisNexis 2016), and also seeks a declaratory judgment, arising from a dispute over bonuses allegedly owed to Tsai under a 2024 bonus agreement. Tsai has also filed a Motion for a Preliminary Injunction in which he requests that the Court freeze Inspire's assets in the amount of the potential total recovery in this action and that he receive information on Inspire's financial position and all of Inspire's financial transactions during the pending litigation. Defendants have filed a Motion to Dismiss based on a lack of personal jurisdiction over the Individual Defendants and for a failure to state a claim. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local. R. 105.6. For the reasons set forth below, the Motion for a Preliminary Injunction will be DENIED, and the Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In 2024 and 2025, Plaintiff Tsung-Ying Tsai was Senior Vice President for Real World Evidence ("RWE") at Inspire, a healthcare technology company incorporated in Delaware and with its principal place of business in Arlington, Virginia. Inspire has several employees who work remotely from Maryland, and it engages in various revenue-generating activities from Maryland. Tsai generally worked remotely from his home office in North Bethesda, Maryland, and he engaged in sales activities and attended client meetings in Maryland on behalf of Inspire.

Defendant Brett Kleger is the Chief Executive Officer ("CEO") of Inspire and a resident of Virginia. Tsai asserts that Kleger had direct control over Inspire's wage payment decisions, including in relation to Tsai. Defendants Russell Bantham, who resides in Virginia, and Dan Levine, who resides in New York, are members of Inspire's Compensation Committee, which exercises control over bonus determinations and wage payments at Inspire.

### I.    The 2024 Bonus Agreement

On June 25, 2024, Tsai signed Inspire's 2024 Variable Bonus Plan Agreement ("the 2024 Bonus Agreement"), which provided that Tsai would earn (1) a $30,000 bonus if Inspire met a 2024 target of a loss of less than $6 million as measured by its earnings before interest, tax, depreciation, and amortization ("EBITDA"), referred to as the "2024 EBITDA loss target" ("the EBITDA bonus"); (2) a $120,000 bonus if Inspire met a 2024 target of $6 million in sales relating to RWE, referred to as the "2024 RWE bookings goal" ("the RWE target bonus"); and (3) an additional bonus of three percent of all RWE bookings that exceeded the $6 million RWE bookings goal ("the RWE overage bonus"). 2024 Bonus Agreement at 1–3, Am. Compl. Ex. 1, ECF No. 17-1. If these targets were not met, Tsai could still earn lower, prorated bonus amounts if the EBITDA loss was less than $7.5 million or if the RWE bookings were above $3 million in 2024.

The 2024 Bonus Agreement included tables defining the bonus payout for different levels of EBITDA loss and RWE bookings for 2024.

The 2024 Bonus Agreement also stated that Inspire "expect[ed] that 2024 bonuses will be paid before the end of February 2025," and that Inspire's Compensation Committee would make "all final determinations" on any "disputes regarding the interpretation of this plan, calculations, whether a booking is a valid booking which should be counted towards goal and bonus calculations." *Id.* at 3–4. The 2024 Bonus Agreement also stated that it could "only be changed in writing," and that "[a]ny and all changes to your bonus plan must be approved by Inspire's compensation committee, documented in a new bonus plan or as an amendment to this bonus plan, and signed by both you and the CEO or CFO of Inspire," but it separately stated that "Inspire reserves the right to change this bonus plan, in writing, at any time." *Id*.

## II.   **Bonus Disputes**

Tsai alleges that for 2024, RWE bookings amounted to $9.52 million. On January 31, 2025, however, Kleger sent an email to certain Inspire employees relating to 2024 bonuses that stated that although the 2024 EBITDA loss target was achieved, because a significant portion of certain 2024 bookings may be canceled or adjusted, Inspire "did not consider the bookings target met for purposes of bonuses." 1/31/25 Kleger Email at 1, Am. Compl. Ex. 2, ECF No. 17-2. Kleger instead stated that Inspire would offer to pay bonus-eligible employees 60 percent of the full 2024 bonus, but that any such payments would be made later, in multiple tranches, starting when there had been two consecutive months of profitability.

On February 10, 2025, Tsai responded to Kleger with an email disputing that the 2024 RWE bookings goal was not met. Specifically, Tsai asserted that the 2024 EBITDA loss target was met and that the 2024 RWE bookings totaled $9.5 million, such that pursuant to the 2024 Bonus

3

Agreement, he was owed (1) the full $20,000 EBITDA bonus, (2) the full $120,000 RWE target bonus, and (3) a $105,000 RWE overage bonus.

After additional emails and a meeting between Tsai and Kleger, on March 12, 2025, Tsai submitted a formal request for review of his 2024 bonus by Inspire's Compensation Committee, which included Kleger, Bantham, and Levine. The Compensation Committee declined to pay Tsai an RWE bonus. On April 17, 2025, after Tsai did not agree to the alternative bonus arrangement that would provide him with 60 percent of the full 2024 bonus, Inspire paid him an $18,000 EBITDA bonus for 2024.

### III.   The Complaint

On April 23, 2025, Tsai filed the original Complaint in this case in the Circuit Court for Montgomery County, Maryland. On June 4, 2025, Defendants removed the case to this Court based on diversity jurisdiction. In the presently operative Amended Complaint, Tsai alleges the following causes of action in the following numbered counts: (1) breach of contract; (2) a violation of the MWPCL; and (3) a claim for a declaratory judgment.

### DISCUSSION

### I.   Motion for a Preliminary Injunction

Tsai has filed a Motion for a Preliminary Injunction in which he requests that the Court issue an order to freeze Inspire's assets so that funds will be available to pay any judgment in this case and to require the provision of detailed information about Inspire's financial situation and transactions during the pending litigation.

To obtain a preliminary injunction, moving parties must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in their favor; and (4) an injunction is in the public interest.

4

*See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of the four factors must be satisfied for the moving party to obtain a preliminary injunction. *See Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

The Motion fails for two reasons. First, the United States Supreme Court has held that unless a party has a lien or equitable interest in certain assets of another party, federal district courts generally lack the authority to issue a preliminary injunction to freeze a party's assets pending adjudication of a claim for money damages. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 310, 333 (1999). The exception for an equitable interest requires a showing that the plaintiff has "a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets," which in turn requires a showing of a "nexus between the assets sought to be frozen through an interim order and the ultimate relief requested in the lawsuit." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496–97 (4th Cir. 1999) (permitting a preliminary injunction freezing specific assets that were the proceeds of the fraud alleged by the plaintiff). Here, Tsai has identified no such nexus between any of Defendants' assets and the money damages he seeks as a remedy to his claims for a breach of contract and a violation of the MWPCL.

Second, whether in relation to his request for the freezing of assets or for the provision of information about Inspire's financial activities, Tsai has not demonstrated a likelihood of irreparable harm in the absence of preliminary relief. To establish irreparable harm, "the movant must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent," and that the harm is irreparable, "meaning that it cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted). "Where the harm

5

suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Sys., Inc. v. InterDigital Commun. Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

Tsai alleges that Defendants are in a state of financial distress that threatens his ability to recover money damages upon judgment. In a pre-*Grupo Mexicano* case, the United States Court of Appeals for the Fourth Circuit stated that a preliminary injunction may be warranted under circumstances such as when a defendant is insolvent, its business is "virtually at a standstill," its "preferences to creditors" are probable, and its assets are "in danger of dissipation and depletion." *U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1330 (4th Cir. 1989) (quoting *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 285 (1940)). Tsai's general references to certain cost-cutting measures undertaken by Inspire and to Inspire's reliance on insurance funding for defense costs, delayed payments to certain employees, sales below stated projections, and deteriorating client relationships are insufficient to demonstrate likely insolvency and inability to satisfy a judgment. Where Tsai has not demonstrated likely irreparable harm, the Court need not address the remaining factors. The Court will deny the Motion for a Preliminary Injunction.

## II.    Personal Jurisdiction

In their Motion to Dismiss, Defendants initially seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) of the claims against the Individual Defendants based on a lack of personal jurisdiction.

### A.    Legal Standards

Under Rule 12(b)(2), the plaintiff has the burden to establish personal jurisdiction. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993). To carry that burden at the pleading stage, the plaintiff need only make a *prima facie* showing that the defendant is properly

6

subject to the court's jurisdiction. *Id.* at 60. In evaluating the plaintiff's showing, a court must accept the plaintiff's allegations as true and must resolve any factual conflicts in the plaintiff's favor. *Id.* The court may consider affidavits and other submitted evidence in resolving a Rule 12(b)(2) motion. *See CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763–64 (D. Md. 2009).

For a district court to assert personal jurisdiction over a nonresident defendant, the exercise of jurisdiction (1) "must be authorized under the state's long-arm statute"; and (2) "must comport with the due process requirements of the Fourteenth Amendment" to the United States Constitution. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). The Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6–103 (West 2020), authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause. *See ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002); *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 878 A.2d 567, 576 (Md. 2005). There may be cases, however, in which personal jurisdiction comports with federal due process but which present factual scenarios outside the scope of the long-arm statute. *Krashes v. White*, 341 A.2d 798, 804 (Md. 1975). Thus, the jurisdictional analysis under the long-arm statute does not necessarily collapse into the due process analysis. *See Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006) (stating that although the "long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause," it is not "permissible to simply dispense with analysis under the long-arm statute").

As to due process, a court may exert personal jurisdiction over a nonresident defendant in keeping with due process if the defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and

7

substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).   In assessing the presence of minimum contacts, courts distinguish between two types of personal jurisdiction: general and specific.   General jurisdiction offers a path to personal jurisdiction when the suit brings "causes of action arising from dealings entirely distinct from" the defendant's contacts with the forum.   *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Int'l Shoe Co.*, 326 U.S. at 318).   Specific jurisdiction provides authority "over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).   As clarified in Tsai's memorandum in opposition to the Motion to Dismiss, Tsai claims only that this Court may exercise specific personal jurisdiction over the Individual Defendants.

To assess whether a defendant has minimum contacts with the forum state such that specific personal jurisdiction exists, a court must consider "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).   A plaintiff must prevail on each prong.   *Id.*   On the first factor, whether the defendant purposefully availed itself of the privilege of conducting business in the state, the Fourth Circuit has identified a list of nonexclusive factors to consider:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature,

8

quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2018)). The focus should be on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

In assessing whether a non-resident corporate officer or agent is subject to personal jurisdiction in the forum state, the general contacts of the company "are not attributed to a corporate agent for jurisdictional purposes," but such a corporate agent may be subject to personal jurisdiction in the forum state if that individual "had sufficient contacts" with the state, "even if those contacts were made ostensibly on behalf" of the company. *ePlus Tech., Inc. v. Aboud,* 313 F.3d 166, 177 (4th Cir. 2002); *see Calder v. Jones*, 465 U.S. 783, 790 (1984) (stating that "status as employees does not somehow insulate" such personnel "from [personal] jurisdiction"). A non-resident corporate agent may be subject to personal jurisdiction under the Maryland long-arm statute under the same circumstances. *W. Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1199–200 (4th Cir. 1989) (for purposes of the Maryland long-arm statute, rejecting the position that actions taken by a corporate employee in a corporate capacity cannot form the predicate for personal jurisdiction in the employee's individual capacity in part because that statute extends to the limits of due process).

## B.  Kleger

At this stage, Tsai has made a *prima facie* showing that the Court has personal jurisdiction over Kleger. Under the Maryland long-arm statute, a court "may exercise personal jurisdiction over a person, who directly or by an agent . . . [t]ransacts any business or performs any character of work or service" in Maryland. Md. Code Ann., Cts. & Jud. Proc. § 6–103(b)(1). Where section

9

6–103(b)(1) provides personal jurisdiction over someone who transacts business in Maryland through an agent, it "does not require the defendant to have been physically present in Maryland in order to have 'transacted business' within the meaning of the statute." *Hausfeld v. Love Funding Corp.*, 16 F. Supp. 3d 591, 599 (D. Md. 2014). Where the Amended Complaint alleges that Kleger personally manages Inspire's business operations in Maryland and personally directed Tsai's Maryland business activities, which included attending AstraZeneca meetings in Gaithersburg, Maryland and developing business from Maryland-based client relationships, the Court finds that he has, through an agent, engaged in work in Maryland. *See Sigala v. ABR of VA, Inc.*, 145 F. Supp. 3d 486, 488, 490 (D. Md. 2015) (finding that company owners and officials who directed the plaintiff employees' work on Maryland job sites were properly subject to personal jurisdiction under section 6–103(b)(1) of the Maryland long-arm statute).

As for due process, the same facts are sufficient to demonstrate that the Amended Complaint adequately alleges that Kleger has had minimum contacts with Maryland such that the exercise of personal jurisdiction would comport with due process. When the allegations are viewed in the light most favorable to Tsai, they show that Kleger, by directing Tsai's Maryland business activities, including attending business meetings in Maryland and developing business from Maryland-based client relationships which generated substantial revenue for Inspire, reached into Maryland to initiate business, deliberately engaged in significant or long-term business activities in the State, and engaged in substantial communications about those business activities. *See UMG Recordings*, 963 F.3d at 352; *see also Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (finding that an Illinois-based CEO's contacts with the District of Columbia were sufficient to require the district court to determine whether they establish personal jurisdiction where the CEO conducted oversight of the company's Washington, D.C. office, made numerous

10

communications with that office including with the plaintiff, and called the plaintiff while she was in Washington, D.C. in order to fire her, the last of which was arguably "alone . . . sufficient to support specific personal jurisdiction" over the CEO). Because these contacts related in part to Tsai, and Kleger's communications with Tsai while Tsai was known to be in Maryland included emails about the bonus dispute, Tsai's claims relating to that dispute can be viewed as arising from the Maryland contacts.

Finally, the Court finds that the exercise of personal jurisdiction is constitutionally reasonable upon consideration of the burden on Kleger, the interests of Maryland as the forum state, and Tsai's interests in obtaining relief. *See CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (4th Cir. 2009) (stating that these factors inform the constitutional reasonableness analysis). Here, it was reasonably foreseeable that Kleger could be subject to suit where he directed business activities occurring in Maryland, including those undertaken by Tsai while he was working full-time for Inspire in Maryland, and where Kleger directly communicated with Tsai while he was in Maryland, including about the bonus dispute. Moreover, Maryland has a strong interest in the resolution of claims relating to the pay for the in-state work of one of its citizens, and Tsai has a substantial interest in obtaining relief in a court within his home state. *See id.* (stating that "the inequity of being haled into a foreign forum is mitigated if it was reasonably foreseeable that the defendant could be subject to suit there."). The Court thus finds that the exercise of personal jurisdiction over Kleger would not offend traditional notions of fair play and substantial justice. *See ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 177 (4th Cir. 2002) (holding that "the exercise of jurisdiction over [a corporate officer] does nothing to offend traditional notions of fair play and substantial justice" where the officer's business transactions with the state were such that the officer knew or should have known that she could be sued there).

11

Thus, upon consideration of all three prongs, the Court finds that, at this early stage, Tsai has alleged sufficient facts to support a *prima facie* showing of specific personal jurisdiction over Kleger.

### C.    Bantham and Levine

In contrast, Tsai has not plausibly alleged that this Court may exercise personal jurisdiction over Bantham and Levine, whose only connection to Tsai and his claims is that they were members of the Compensation Committee. As to their contacts with Maryland, the Amended Complaint alleges that Bantham and Levine "personally participated in deliberations and decisions specifically regarding [Tsai's] Maryland-based compensation, knowing their decisions would have direct effects on Plaintiff in Maryland." Am. Compl. ¶ 12(b), ECF No. 17. Unlike for Kleger, the emails and other correspondence do not show that either Bantham or Levine sent any communications to Tsai while he was in Maryland about the bonus dispute or otherwise. To the extent that Bantham and Levine made a decision outside of Maryland that had an effect on Tsai, a Maryland resident, such a decision was insufficient to demonstrate minimum contacts in support of personal jurisdiction. In *Walden v. Fiore*, 571 U.S. 277 (2014), the Supreme Court held that a Georgia law enforcement officer's seizure of cash from two Nevada residents at a Georgia airport and drafting of an allegedly false affidavit for use in seeking forfeiture of the funds did not establish personal jurisdiction over the officer in Nevada even though he was aware of the plaintiffs' state of residence and the fact that his actions would have effects on the plaintiffs in Nevada. *Id.* at 280–82. In so ruling, the Court reasoned that to allow for the exercise of personal jurisdiction consistent with due process, "the defendant's suit-related conduct must create a substantial connection with the forum State" that "arise[s] out of contacts that the defendant himself creates

with the forum state" and "not the defendant's contacts with persons who reside there," because "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 284–85.

Here, the allegations in the Amended Complaint show that neither Bantham nor Levine had any connection to Maryland other than that they participated in decisions relating to bonuses that had an effect on Tsai while he was in Maryland, and perhaps other remote personnel who worked from Maryland. Where the link between these defendants and Maryland was Tsai himself, and Bantham and Levine had no contacts with the forum itself, the Court finds that the fact that Tsai may have experienced the effect of the bonus decision in Maryland is insufficient to establish specific personal jurisdiction over these members of the Compensation Committee. *See id.* at 291. The Motion to Dismiss will therefore be granted as to Bantham and Levine based on a lack of personal jurisdiction and denied as to Kleger.

## III.   Failure to State Claim

Defendants also seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Tsai has failed to allege sufficient facts to support plausible claims for relief, including as to claims for a breach of contract, a violation of the MWPCL, and a declaratory judgment.

### A.   Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable

13

to the plaintiff.  *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

In considering a Rule 12(b)(6) motion, a court may consider the operative complaint and any attachments to it. *Sec'y State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  The Court therefore may consider the Amended Complaint and its exhibits, which include the 2024 Bonus Agreement, communications between Tsai and Inspire about the bonus dispute, and other related documents.

### B.    Breach of Contract

In the breach of contract claim in Count 1, Tsai alleges that Defendants breached the 2024 Bonus Agreement by failing to pay him the RWE target bonus, the EBITDA bonus, and the RWE overage bonus, totaling $245,600, by February 28, 2025.  Defendants seek dismissal of this claim on the grounds that (1) the claims against the Individual Defendants fail because they were not parties to the 2024 Bonus Agreement; and (2) under the terms of that agreement, Tsai was owed only an $18,000 EBITDA bonus, which Inspire paid once Tsai turned down the alternative bonus arrangement proposed to Inspire employees.

Under Maryland law, courts are to follow "the law of objective contract interpretation, which provides that '[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding.'" *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Slice v. Carozza Properties, Inc.*, 137 A.2d 687, 693 (Md. 1958)).  A court must therefore seek to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id. (quoting Gen. Motors*

14

*Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)). In interpreting contractual language, "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). "[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n*, 73 A.3d at 232–33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)).

"If the contract is unambiguous, then the court construes it as a matter of law." *Sprint Nextel Corp. v. Wireless Buybacks Holdings*, 938 F.3d 113, 126 (4th Cir. 2019). Under Maryland law, a contract is ambiguous if the written language of the contract is "susceptible to multiple interpretations by a reasonable person." *Id.* (quoting *Dumbarton Improvement Ass'n*, 73 A.3d at 233–34). In construing an ambiguous contract or term, a court may consider extrinsic evidence to determine "what the parties intended in adopting the contract" or term. *Id.* Thus, "the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion [to dismiss] for failure to state a claim." *Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992).

### 1. Individual Defendants

Defendants first seek dismissal of the breach of contract claims against the Individual Defendants because they are not parties to the 2024 Bonus Agreement. Although the claims against Bantham and Levine are already subject to dismissal for lack of personal jurisdiction, the analysis is the same as to all three Individual Defendants.

15

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.,* 776 A.2d 645, 651 (Md. 2001). Here, Tsai has not plausibly alleged that Kleger, Bantham, or Levine was personally a party to the 2024 Bonus Agreement, which was plainly an agreement between Inspire and Tsai. *See Bagwell v. Peninsula Reg'l Med. Ctr.,* 665 A.2d 297, 302, 307 (Md. Ct. Spec. App. 1995) (finding no valid breach of contract claim against three officers or employees of a regional medical center arising from an alleged breach of the terms of the medical center's employee handbook where there was no evidence that the plaintiff had entered into any employment contract with those individuals personally). Indeed, none of the Individual Defendants even signed that agreement, which was signed by "Jennifer Moyer, Interim CEO and [Chief Financial Officer]." 2024 Bonus Agreement at 4. The breach of contract claims against the Individual Defendants will therefore be dismissed.

### 2.   EBITDA Bonus

As to the breach of contract claim against Inspire, Tsai has not plausibly alleged such a breach in relation to the 2024 EBITDA bonus. As part of the breach of contract claim, the Amended Complaint alleges a breach of the 2024 Bonus Agreement based on the fact that Tsai was not paid a $30,000 EBITDA bonus for 2024 by February 28, 2025. Neither this amount nor this hard deadline is supported by the plain language of the 2024 Bonus Agreement.

First, Tsai has asserted in the Amended Complaint that Inspire had an EBITDA loss of $7.19 million in 2024, Am. Compl. ¶ 21, and Attachment II to the 2024 Bonus Agreement consists of a table that specifically provides that at an EBITDA loss level of $7.19 million, the EBITDA bonus would be either $15,000 or $18,000, not the full $30,000, which would be owed only if the

EBITDA loss was less than $6 million. Thus, based on the express terms of the 2024 Bonus Agreement, the 2024 EBITDA bonus was correctly calculated as $18,000.

Second, although Tsai contends that Defendants breached the 2024 Bonus Agreement by "failing to pay the earned bonus by the February 28, 2025 deadline" and instead paying it in April 2025, the agreement contains no language imposing a February 28, 2025 deadline. *Id.* ¶ 42. Rather, the relevant language states only that Inspire "expect[s] that 2024 bonuses will be paid before the end of February 2025, considering the necessary time to finalize all signed definitive agreements for 2024 bookings." 2024 Bonus Agreement at 3. Regardless of whether Inspire's explanation for the April 2025 payment, that it was waiting for a response on whether Tsai would accept the alternative proposal of a deferred 2024 bonus of 60 percent of the full amount, is factually accurate, the plain language of the contract imposes no requirement that the 2024 bonus be paid before February 28, 2025. The Court therefore finds that Defendants did not breach the EBITDA bonus provision of the 2024 Bonus Agreement by paying an $18,000 EBITDA bonus in April 2025.

### 3.    RWE Bonus

In contrast, the Court finds that, construing the Amended Complaint in the light most favorable to the plaintiff, Tsai has plausibly alleged that Inspire breached the 2024 Bonus Agreement by failing to pay him the full RWE target bonus and the RWE overage bonus (collectively, "the RWE bonus") for 2024. In the Amended Complaint, Tsai alleges that Inspire's RWE bookings for 2024 were $9.52 million, which, pursuant to the terms of the 2024 Bonus Agreement, including the table in Attachment I, would require payment of the full $120,000 RWE target bonus as well as an RWE overage bonus of three percent of the RWE bookings amount above $6 million. He attached to the Amended Complaint a financial summary stating that

17

Inspire's "2024 Preliminary" RWE bookings were $9.52 million. Fin. Summary at 1, Am. Compl. Ex. 11, ECF No. 17-8. Inspire argues that the actual RWE bookings ended up below $6 million, including because the Amgen contract was later deemed to not qualify as an RWE booking for 2024, and Kleger made such an assertion in his January 2025 email. However, where Tsai maintains that "the Amgen contract and other major deals were 'RWE bookings' for performance measurement purposes," Am. Compl. ¶ 23, and there is nothing in the plain language of the 2024 Bonus Agreement that would definitively exclude that contract from the category of 2024 RWE bookings, the question of whether the $6 million threshold for the full RWE bonus was achieved is a factual dispute for which discovery is necessary.

Although Tsai asserts that the 2024 Bonus Agreement includes language requiring that the RWE bonus be paid even if the RWE bookings figure is later adjusted downward, the identified provision does not apply to the question of whether the full $120,000 RWE target bonus had to be paid. The relevant language states that "if you are paid 3% on any booking once the $6.0M goal is exceeded, and that booking is subsequently canceled or amended in a way that reduces the overall booking, the amount that you were paid will be deducted from a future bonus payment or your final paycheck in the event you[r] employment is terminated for any reason." 2024 Bonus Agreement at 3. This language unambiguously applies only to the RWE overage bonus, consisting of three percent of RWE bookings over $6 million, not the full RWE target bonus of $120,000, and only under the circumstance in which that overage bonus has already been paid out, which did not occur here. The 2024 Bonus Agreement is thus silent on what payments are due in the event that, before any payment of the RWE target bonus, Inspire asserts that cancellation or amendment of certain RWE bookings causes the total 2024 RWE bookings to fall below $6 million. Because the 2024 Bonus Agreement does not address and is therefore ambiguous on this issue, and because

18

there remains a factual dispute on whether Inspire correctly determined that the 2024 RWE bookings were below $6 million, the Court finds that, drawing all inferences in favor of the plaintiff, Tsai has stated a plausible breach of contract claim relating to the RWE bonus. The Motion to Dismiss will therefore be denied as to the breach of contract claim relating to the RWE bonus.

### C. MWPCL

Count 2 of the Complaint asserts that Inspire's failure to pay the 2024 bonus to Tsai violated the MWPCL. "The MWPCL is a statutory cause of action, the purpose of which is 'to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'" *Cunningham v. Feinberg*, 107 A.3d 1194, 1202 (Md. 2015) (quoting *Battaglia v. Clinical Perfusionists, Inc.*, 658 A.2d 680, 686 (Md. 1995)). As relevant here, it provides that "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md. Code Ann., Lab. & Empl. § 3–505(a). It defines a wage as "all compensation that is due to an employee for employment," including "a bonus." *Id.* § 3–501(c)(1), (2)(i). The MWPCL provides to employees a private right of action to seek unpaid wages from their employers and further provides that if "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." *Id.* § 3–507.2(b).

In the Motion to Dismiss, Defendants do not contest the applicability of the MWPCL to a failure to pay a bonus such as those referenced in the 2024 Bonus Agreement. Rather, Defendants argue that (1) the MWPCL claim should be dismissed because Inspire properly declined to pay the

2024 RWE bonus where the RWE bookings did not meet the required target; and (2) at a minimum, the MWPCL claims against the Individual Defendants should be dismissed because they are not "employer[s]" subject to liability under the MWPCL. *Id.* § 3–505(a).

### 1. MWPCL Violation

As to the first argument, as discussed above, where the Court has already concluded that Tsai has plausibly alleged that Defendants did not pay his 2024 RWE bonus in violation of the 2024 Bonus Agreement, *see supra* part III.B.3, the Court in turn finds that he has plausibly alleged an MWPCL claim that Inspire failed to "pay an employee . . . all wages due for work that the employee performed," which includes that bonus. Md. Code Ann., Lab. & Empl. §§ 3–505(a), § 3–501(c)(1), (2)(i). The Motion will therefore be denied as to the MWPCL claim against Inspire.

### 2. Individual Defendants

As for the argument that the MWPCL claims against the Individual Defendants must be dismissed because they are not individually liable for any MWPCL violation, because the Court will dismiss all claims against Bantham and Levine based on the lack of personal jurisdiction, it will address this issue only as to Kleger.

Whether Kleger may be individually liable under the MWPCL turns on whether he qualifies as an "employer" as defined by that statute. *Campusano v. Lusitano Const., LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012). As discussed above, an "employer" under the MWPCL includes "any person who employs an individual in the State or a successor of the person." Md. Code Ann., Lab. & Empl. § 3–501(b). To determine whether an individual can be a considered an employer under this definition, Maryland courts use the "economic reality" test originally developed by the federal courts for claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. *Campusano*, 56 A.3d at 307–08. Specifically, courts consider whether the employer (1) had the

power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Newell v. Runnels*, 967 A.2d 729, 772 (Md. 2009); *Campusano*, 56 A.3d at 309. Consideration of these four factors is aimed at assessing the broader question of whether the putative employer played a role in "causing" the underpayment of the employee and the decision to prioritize other financial obligations or the retention of profits. *Campusano*, 56 A.3d at 310 (*quoting Baystate Alt. Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)). Other relevant indicia include "an individual's operational control over significant aspects of the business and an individual's ownership interest in the business," which can suggest that an individual "controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance" with the wage law. *Id.* at 309–10.

Because the MWPCL does not impose liability on "a mere supervisor of another employee," the Fourth Circuit has found that plaintiffs had not stated a plausible claim that a CEO was an "employer" for purposes of the MWPCL based only on the allegations that the CEO had informed them that they were terminated because the company could no longer pay their salaries. *Odjaghian v. HHS Tech. Group, LLC*, 848 F. App'x 534, 540 (4th Cir. 2021). Neither the Fourth Circuit nor the Maryland Supreme Court has addressed what additional facts could support a claim that a CEO is an "employer" under the MWPCL. "Given the substantial textual similarities between the FLSA and the Maryland Wage Laws, Maryland appellate courts have looked to the FLSA, and to federal courts' interpretations of the FLSA" in interpreting the MWPCL. *Martinez v. Amazon.com Services LLC*, 338 A.3d 636, 651 n.7 (Md. 2025). Applying the economic reality test in the context of the FLSA, courts have found that a CEO of a large organization may be an "employer," particularly when that official had some direct or indirect responsibility relating to wages. *See*

21

*Irizarry v. Catsimatidis*, 722 F.3d 99, 111, 114–17 (2d Cir. 2013) (holding that the CEO of a large grocery store company was an employer under the FLSA because he had the power to hire and fire employees, supervised managerial employees, and had "control" over the company's finances, including tracking payroll and having "ultimate responsibility for the plaintiffs' wages"); *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 48–49 (1st Cir. 2013) (finding that a CEO who oversaw the corporate budget, was involved in hiring employees and reducing jobs due to budgetary constraints, and "not only possessed, but repeatedly exercised the authority to establish company-wide policy regarding employment-related matters and made significant decisions regarding the allocation of financial resources that directly affected [the company's] employees" was an "employer" for purposes of the FLSA).

Applying the economic reality test, the Court finds that Tsai has plausibly alleged that Kleger is an "employer" for purposes of the MWPCL. First, given Kleger's position as Inspire's CEO, it is reasonable to infer that he had the authority to hire and fire Tsai and other employees. Second, as to supervision and control, the allegations in the Amended Complaint that Kleger personally directed Tsai's Maryland business activities, including his attendance at AstraZeneca meetings in Gaithersburg, and that he "personally negotiated [Tsai's] Maryland-based employment arrangement," support an inference that he had supervision over Tsai's work schedule and conditions of employment. Am. Compl. ¶ 7. Third, the Amended Complaint alleges that Kleger had "personal control over wage payment decisions" and in fact had acted personally to withhold wages from Tsai, *id.*, and these allegations are corroborated by the attachments to the Amended Complaint, which include the 2024 Bonus Agreement signed by a prior CEO, emails showing that Kleger was on the Compensation Committee, and emails to and from Kleger demonstrating that he personally engaged with Tsai in relation to the bonus dispute. Collectively, these facts support

22

the inference that Kleger had a significant role in determining the rate and method of payment of wages and bonuses.

Further, in relation to the third factor, Tsai alleges that Kleger withheld bonuses due in part to cash flow challenges and active fundraising efforts and thus "prioritize[d] corporate cash preservation over contractual wage obligations." Am. Compl. ¶ 24. Significantly, such an act of "*causing* the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits" is the central focus of the economic reality test and weighs in favor of a finding that the officer engaged in such an action was an "employer." *See Campusano*, 56 A.3d at 310 (quoting *Baystate Alt. Staffing*, 163 F.3d at 678).

Although there are no allegations relating to whether, in relation to the fourth factor, Kleger maintained employment records, the Court finds that where the allegations relating to the other three factors support the conclusion that Kleger was Tsai's "employer" for purposes of the MWPCL, the Court will deny the Motion as to the argument that the MWPCL claim against Kleger should be dismissed because he cannot be held individually liable.

### D.    Declaratory Judgment

Defendants also seek dismissal of Tsai's claim in Count 3 for a declaratory judgment on matters of contract interpretation relating to the 2024 Bonus Agreement and the more recent 2025 Bonus Agreement. Generally, a district court should entertain a declaratory judgment action when it finds that the relief sought "(1) will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna Cas. & Sur. Co. v. Ind.-Com. Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998). However, a declaratory judgment action should not be used "to try a controversy by piecemeal, or to try particular issues without settling the entire controversy, or to

interfere with an action which has already been instituted." *Id.* In deciding whether to issue a declaratory judgment, courts also consider issues of "federalism, efficiency, and comity." *Id.*

The declaratory judgment sought by Tsai in relation to the 2024 Bonus Agreement would include rulings on specific matters of contract interpretation at issue in this case. These issues include interpretations of contract language relating to contract modification procedures, provisions relating to whether and how adjusted bookings should be treated, and provisions imposing other limitations on the determination of bonuses. Where these issues relate to terms in the 2024 Bonus Agreement that may need to be interpreted in order to resolve this controversy, it is premature to determine that there is no basis for the issuance of a declaratory judgment. The Motion will therefore be denied as to the request for a declaratory judgment relating to the 2024 Bonus Agreement.

In contrast, Tsai does not plausibly allege that a declaratory judgment relating to the 2025 Bonus Agreement is warranted. Tsai acknowledges that the 2025 Bonus Agreement is a separate contract from the 2024 Bonus Agreement and takes issue with its terms. However, he has not identified a particular dispute over, or alleged breach of, the 2025 Bonus Agreement and has not plausibly alleged that future litigation over the 2025 Bonus Agreement is likely absent a declaratory judgment, particularly given that Tsai appears to have left his position at Inspire in mid-2025. *See* Reply at 1, ECF No. 29; *Wells v. Johnson*, 150 F.4th 289, 302 (4th Cir. 2025) (noting that for a party to have standing at the pleading stage in relation to a declaratory judgment action, a plaintiff must plausibly allege "both that future litigation is likely to happen (at least absent the declaration sought) and that the declaration's preclusive effect will likely help him in that litigation"). Rather, it appears that he is seeking an advisory opinion relating to the 2025 Bonus Agreement. "That courts may not issue advisory opinions is one of the most long-standing

24

and well-settled jurisdictional rules." *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019). The Court will therefore grant the Motion as to the request for a declaratory judgment relating to the 2025 Bonus Agreement.

## CONCLUSION

For the foregoing reasons, Tsai's Motion for a Preliminary Injunction will be DENIED, and Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that the claims against Defendants Bantham and Levine will be dismissed without prejudice for lack of personal jurisdiction, and the breach of contract claim in Count 1 against Defendant Kleger and any declaratory judgment claim in Count 3 relating to the 2025 Bonus Agreement will be dismissed for failure to state a claim. Defendants' Motion will be otherwise denied. A separate Order shall issue.

Date:  November 24, 2025

THEODORE D. CHUANG
United States District Judge